Next case for argument, United States v. Dillard. Miss Veselbeck. Good morning, and may it please the court, Jasmina Veselbeck on behalf of the appellant Lance Dillard. Your honors, Mr. Dillard's right to a fair trial was threatened for three highly prejudicial reasons. The first involved the prosecution's unwarranted introduction of a hobo gang reference during its cross-examination of a defense witness. The second involved the repeated admission, styled as witness credentials, of gang references throughout the government's case. The third involved the court's inadequate handling of a highly prejudicial news article that was published and then republished during trial, which contained facts that were specifically excluded from the record, and which named both defendants in the murder as related to the murder of the confidential informant that was important for the government's case. Now, your honors, the government's key evidence relied on the confidential informant's testimony during four interactions which comprised the government's case. Unfortunately, the confidential informant was murdered before trial began and as such was unable to testify. To compensate, the government introduced gang references throughout the trial and specifically introduced the gang reference, the hobos, during its cross-examination. The hobo gang, as you, your honors, may know, is an infamous Chicago gang that is constantly mentioned in the news as being a perpetrator of violent acts and the government relied on a supposed open door for its justification to introduce the gang evidence, however, that open door was meritless because the defense witness, Dennis Myers, on whose cross-examination the hobo gang reference was introduced, only testified to refute the voice and phone identification on which the government primarily relied. Had any jury member known of the word hobo and known what it meant and informed the other deliberations as a whole and there was no linking evidence between the gang and the charged crimes. To make matters worse, a highly prejudicial news article was published during the trial. So what do you think the judge should have done with regard to, you know, the newspaper article and Sun Times article and so on? Your honor, upon the jury's return on Monday morning, the judge should have polled the jurors to determine whether any of them had seen the article or any articles related to the case. Well, the judge did ask the jury as a whole if anybody had seen it, and then one juror said yes? Yes. And then the rest were excused and there was an individual voir dire of that juror and he was dismissed. That's correct, your honor. And then, so that happened on a Friday afternoon. So we have no idea whether any other jurors saw the article because he never asked them. So we don't know if the jury deliberations were compromised. And this article was so prejudicial that had any juror read it, they would have been unable to unring the bell of prejudice, so to speak. And so it was imperative in this case with this factual scenario to question the jurors upon their return on Monday morning to determine whether any of them had seen the article. He did voir dire the jury collectively about whether they had seen the article and only the one juror responded, right? And then there was a follow-up after the... So on Thursday... The reposting of it? Well, you don't think the judge should have spoken to each juror individually, right? I'm not even saying he had to go that far necessarily. Oh, no, he shouldn't. No, no, no. That is much better than asking a group, right? I agree with you, your honor. People elected to speak in the presence of others, right? I agree. And the court didn't even do that, right? It didn't even collectively ask the jurors, much less individually ask. And in a different situation, one, pulling the jury one time upon publication of the article may have been enough, but the facts of this case were so egregious and so unique that the court needed to, at the very least, question them again upon their return from the weekend and before deliberations started. And what had happened over the weekend that would have required that? The fact that, A, we knew that one juror, at the very least, had seen the article, and the jurors had... Well, so let me back up. So Thursday, the hobo gang reference is introduced. So regardless of whether any juror had previously known of the hobo gang reference, they now had all weekend to research what that meant. And whether or not they came across that article, that would have... That no juror had. Because of the... What actually happened over the weekend? We don't know, Your Honor. I mean, what publicly happened over the weekend? Nothing, Your Honor, other than the jurors were given several days to look into this. So we're supposed to assume that they did all this independent research? No, Your Honor. But we don't know what happened during the jury deliberations because there was no questioning of the juror as a whole or individually. Well, you can't question jurors about what happened during deliberations. Exactly. But that's why it was the court's... You're saying we had to. You're saying the judge had to. Well, the judge had to ask the jurors on Monday morning to determine whether any of them had seen the article. The article had been published the week before, long before the weekend. So why does he have to come back to it at the end of the weekend? So, Your Honor, the article was originally published on Monday night, and then the jurors who had to be excused discovered the article on Friday afternoon. So regardless of when the article was published, jurors had the opportunity to find it. And the article was so prejudicial that... You seem to be suggesting that he couldn't rely on having asked the jurors whether anybody had seen the article. He had a duty to come back to it every day and make sure that they hadn't seen the article? Correct, Your Honor. Once they had told him that they hadn't seen the article? Well, they had only told him Thursday. And as Judge Posner mentioned, jurors are unlikely to collectively raise their hand or individually self-report, which is what the court asked them to do. The court asked the jurors to self-report if they had seen the article. And that is a very hard task to ask of jurors, especially given the highly prejudicial nature of this article, which involved the brutal murder of the confidential informant and directly implicated both defendants and the hobo gang, which had been explicitly referenced during the trial. Your Honor, the whole record of this case is problematic with the gang references. Every day of trial, gangs were referenced. Then, the prosecution on Thursday, after all of these gang references, specifically interjected the name of a notorious Chicago gang. This is particularly problematic when examined with this highly prejudicial article that discussed the hobo gang in the murder of the confidential informant, who was absolutely absent during trial without any indication of why. And, Your Honor, just to come back on one note you said, you know, the article was published Monday night, but it was republished on a different news source on Wednesday night, which alerted the court again to admonish the jury and question them. Right, and the court went back to the jury and asked them about that before the end of the week. And, you know, cleared up the problem then. And nothing happened publicly over the weekend. There was no further news coverage. And you're arguing that he had a duty to come back on Monday, just because of the passage of time, even though there were no intervening events? He had a duty to come back to them, to the jury, because of the highly prejudicial nature of this article. You should be arguing, you should be making a different argument. Should have thrown out that jury. Should have started, you know, waited a couple of weeks, maybe a month. Then, a brand new jury, the article's forgotten, you have a clean slate. I agree, Your Honor. Your Honor, we ask, unless you have any other further questions, I would like to save the rest of my time for rebuttal, and we respectfully ask that you grant Mr. Dillard a new trial. Thank you. Okay, thank you very much. Ms. Bonamici? May I please the court? Good morning. Deborah Bonamici on behalf of the United States. With respect to, I'll begin with the last argument first, since that's where we are. With respect to the district court's handling of the article in question here, the record reflects that the district court was exceedingly careful and cautious and acted absolutely appropriately. This is very unrealistic. The notion that you tell a jury, you ask a jury, did anyone do this, read that, you can't trust them. There's an article by Professor Morrison. She talked to a bunch of jurors and the judges always say, mustn't do internet research to the jury. So she asked a bunch of guys, men and women, who've been jurors, did you do internet research during the trial? And they said, of course. But didn't the judge tell you you mustn't do that? They said, yeah. But look, we felt, in each of these cases, we felt the lawyers and the witnesses and the judge were not giving us information that was essential to us. And therefore, we did this illegal research. And this is a danger which the government seems indifferent to and the judges have not yet tumbled to the fact that there's a lot of cheating by the jurors. Your Honor, the government... Do you realize that? I don't agree with the premise that the findings of this particular article that you're referencing are illustrative of every single case and every single jury. In fact, I think there's a lot to be said for the relationship that develops generally, as has been my observation, between jurors and the presiding judge which the respect that develops there, I think, actually does induce jurors to be honest with the judge. And I think that in this case, that was reflected by the conduct of the one juror whose wife told him about the article that he had not previously seen. And he immediately, before doing anything, immediately, even after leaving the courtroom, didn't wait until the next morning, immediately contacted chambers to describe this event. That, to me, is a wonderful illustration of a juror that could be trusted. But you have no idea how common that is. Well, nor does the author of the article that you mentioned. Well, I don't know. The author spoke to jurors. That's what the jurors told him. We have a system, and I'm reluctant to agree with you on that. Look, I don't buy that. It's not sensible. You have these jurors. They realize they're exercising significant governmental power. And if they feel they're not getting from the judge and the lawyers and the witnesses what they need, the temptation to look elsewhere is very great. I think it may be in some cases. And in other cases, they may recognize that the significance of the role that they are playing requires them to meticulously follow the rules that are handed down to them. And I think that we see that time and time again. I don't know how you can see it. Well, again, I'll give you just from this case alone. We could debate this more generally in another context at a different time. But in this case alone, I think you have very good evidence of it. You have a juror who immediately reported the first time that he got any inkling of this. And that, to me, is a good illustration of the fact that number one, the other jurors hadn't seen it, and number two, that the jurors were being careful about following the admonitions they'd received from the court. Do we know that this juror who was excused did not have any further contact with the jury? Yes. He was specifically questioned about whether he had contacted anyone else, and he had said no. And he said no, and then he was directed by the court not to have any further contact with anyone on the subject. And no indication whatsoever was ever given that anybody else had ever seen it. The court, as Your Honor pointed out earlier, the court questioned the jury specifically about this more than once. The court very carefully consulted with counsel for all parties with respect to every step that he took, and the defense lawyers in this case agreed to every step that the court took and made no request for any additional steps to be taken, although the court specifically asked them if they wanted anything else to be done or if they had any further ideas. Now, this is not a prosecution for gang activity, correct? I'm not sure what you mean by that question. The offense is not a gang offense, right? It's just selling. It's not a gang offense. That's correct. Well, I am very troubled, as the second case in which this has occurred, about asking the investigators, the officers, so on, whether they do gang work. Your Honor? Because that's making the jurors think that there must be gang activity in this case. Otherwise, why are they putting on all these officers who work for the gang sector of the police department? Your Honor, we recognize that there's a sensitivity to any mention of gang even in the background of an agent and the potential prejudice that may cause. The office actually has taken steps to ensure, since this trial took place, that our AUSAs are treating this issue with proper care and deliberation and even, we were both present on the day that the last case was argued, I think you know, and after that incident occurred and we were asked to bring the case to the attention of our supervisors. In fact, the front office sent out written guidance to all of the criminal AUSAs with respect to the subject. So it is something we are sensitive to and it's something that we are taking steps to deal with. However, I will point out, as we pointed out in the brief, that this court has held on more than one occasion that the mention of the word gang or violence or these types of things in the context of an agent's background is typically appropriate and not prejudicial. And in this instance, just focused on this case alone, it clearly was not anything but, there was no potential prejudice in my mind but certainly it was minimal in this case given that no one ever tried to connect the background of the agents to the specific facts of the case. No one was called a gang member in the case. That didn't happen. And in fact, the minimal nature of any potential prejudice was highlighted by the fact that the defendants, although they raised the issue of the reference to hobos in their post-trial motions, they did not even raise this issue, the issue of the general background references in their post-trial motions. And that's just an illustration from the perspective of a person who was there on the ground during the trial. With respect to the mention of the hobos, it is incorrect that the door was not opened to that evidence. What happened here was that the witness was called to identify an individual who was present in the car on the day of the June 9th transaction. That individual was his son. His name was Patrick Davis. And the idea was to suggest that there was another person there who may have been or was perhaps the one who was actually working with Chester and who was conducting the drug transaction. The problem with that is that without evidence, true evidence, which we could have put on, without the evidence showing that Patrick Davis, just like Mr. Dillard, just like Mr. Chester, was a member of the hobos gang, and that this was actually, even though the jury was being shielded from this information, the fact is this was a hobo drug transaction and all three of these people were hobos. Therefore, trying to advance this person as an alternate perpetrator was misleading because it suggested that in some way that might exonerate Mr. Dillard, which it certainly did not. That is why the court immediately recognized this testimony and these questions as opening the door to testimony that he had been careful to preclude and expressed some distress over what had happened and allowed questioning to proceed. Now, what wound up happening, which eliminated any potential prejudice really at all, what wound up happening is that when the prosecutor asked the initial question, have you heard of the term hobos? The answer he got was, I read about him in the paper, which stopped the prosecutor flat and that was the end of it. It went no further and that was the end of the discussion and it was never raised again. So, the door was opened, the questioning was proper, it went nowhere, there was no prejudice. Was Judge Schrader still presiding at that point or Judge Feinerman? This was Judge Feinerman. For all of the reasons and the reasons that we presented in our brief, Your Honors, we ask that the judgment of the district court be affirmed in this case. Okay, thank you Ms. Bonamici. Ms. Bezova? I can't pronounce her name. Your Honor, just to correct one thing, Judge Schrader was still presiding throughout the trial. Judge Feinerman took over after the trial was complete from my understanding of the record. So really quickly, the door was not opened here because there had been no evidence on the record that the gangs were at all involved. So regardless of whether the prosecution claims that these individuals were all connected through gangs, there was no evidence on the record that that was at all the case. And Your Honor, Mr. Myers, who is the defense witness, also testified that these individuals had known each other since childhood and had grown up together in the projects. So regardless of whether there was any bias by Mr. Myers or by Mr. Davis, which was the third individual, that was already proven or shown through their connections in childhood. So there was no need to introduce the gang evidence. And Your Honor, you mentioned that jurors look on the internet and do their own independent research. That is exactly why the mention of the word hobo here was so problematic. Regardless of whether it did not go any further, just mentioning the word hobo and then Mr. Myers saying, oh, I heard of it in the paper and then later he says, no, no, I don't mess with that. That is enough to give the jury indication that that was some sort of an important word that maybe required further research. Which, because the court didn't question or because maybe jurors aren't willing to admit that they do internet research, we don't know what happened in the jury deliberation room or whether any juror did independent research that gave them light to what the hobos were. Did the judges ever instruct the jurors that if you have a question that you don't feel that the lawyers, the witness, so on, have addressed and it's important to you, send me the judge a note explaining your problem and I'll make sure that the lawyers present the evidence. Has that ever done? Your Honor, I can't remember if that was done on the record. I don't specifically remember it, but I can't remember. Okay. We'll move on to...